UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION

3:23-cv-00867-RJC-DCK

|  |  |
|---|---|
| MICHELLE BALL, TED TOMS, SOFIA CHABOT, AMELIA BALL, ELIZA BALL, JESSICA MULLEN, and LISA METZGER,<br><br>      Plaintiffs,<br><br>v.<br><br>EAST FRANKLIN SUPERETTE AND KITCHEN, LLC, d/b/a East Frank Superette and Kitchen,<br><br>      Defendant. | **MEMORANDUM IN SUPPORT OF DEFENDANT'S MOTION TO DISMISS AMENDED COMPLAINT** |

Like a drag queen, Plaintiffs' claims masquerade. They dress up as § 43(a) Lanham Act claims, but only for show—even after a quick costume change,[1] the essential elements are missing. Section 43(a) of the Lanham Act, 15 U.S.C. § 1051 *et seq.* (the "Act"), protects only commercial interests, and Plaintiffs alleged no commercial interest to vindicate. They have also failed to allege the use of any device, misstatement, or misdescription of fact that could cause consumer confusion, all necessary elements of § 43(a) claims. Instead, Plaintiffs' Amended Complaint alleges only that Plaintiffs opposed the drag shows at Defendant East Franklin Superette and Kitchen, LLC ("East Frank"), regularly protested outside of East Frank with

---

[1] Rather than respond to Defendant's original motion to dismiss, Plaintiffs filed an Amended Complaint.

signs that accused that business—a purveyor of delicious sandwiches, burgers, and burritos, and an occasional drag show host—of child abuse, child sexual exploitation, and child grooming, and that East Frank defended itself and its business through parodic posts that made use of photos of Plaintiffs and their protests. Those allegations fail to state § 43(a) claims. Rather, they show that Plaintiffs' claims, unlike drag queens, have a nefarious motive: to silence East Frank's social commentary. That purpose falls outside the Act's zone of interests and runs afoul of free speech protections. The Court should dismiss the Amended Complaint.

<u>ALLEGATIONS</u>

Plaintiffs regularly stand outside East Frank holding signs that accuse East Frank—a restaurant in downtown Monroe—of child abuse, child sexual exploitation, and child grooming,[2] all because East Frank, from time to time, hosts a drag show.[3] (Am. Compl. ¶¶ 2, 16-18, 31, 48, 50, Doc. No. 13). To defend itself, East Frank took the Plaintiffs' publicly available photos—almost all of which depict Plaintiffs protesting East Frank—modified them, and included them as part of seven different

---

[2] "Grooming refers to deliberate actions taken by a [person] to expose a child to sexual material." *United States v. Engle*, 676 F.3d 405, 412 (4th Cir. 2012). East Frank does no such thing—it also does not abuse or exploit children. It sells burgers and burritos.

[3] Unlike statements that maliciously and falsely accuse a private business of despicable criminal conduct, drag shows are protected First Amendment expression. *See Woodlands Pride, Inc. v. Paxton*, __ F. Supp. 3d __, 2023 U.S. Dist. LEXIS 171268 *34-35 (S.D. Tex. Sept. 26, 2023) ("Drag shows express a litany of emotions and purposes, from humor to pure entertainment to social commentary on gender roles. There is no doubt that at the bare minimum these performances are meant to be a form of art . . . alone this would warrant some level of First Amendment protection.").

posts, dated February 24, March 3, June 24, June 25, July 12, July 15, and October 21, 2023, to East Frank's social media (collectively, "the Posts"). (Am. Compl. ¶¶ 20, 31, 33, 37, 48, 50, 52). Plaintiffs objected to the Posts. *See* (Am. Compl. ¶ 29).

The Posts do not implicate any of Plaintiffs' commercial interests. They are, moreover, parodies entitled to the full force of First Amendment protection. For these reasons, the Court should dismiss the Amended Complaint.

<u>ARGUMENT</u>

The Court should dismiss the Amended Complaint because Plaintiffs' claims fall outside the Act's zone of interests, fail to allege the necessary elements of § 43(a) claims, and seek to hold East Frank liable for core protected speech—that is, East Frank's parodic social commentary. Plaintiffs' § 43(a) claims shove a square peg into a round hole: § 43(a) protects commercial interests, not personal privacy rights. And despite Plaintiffs' effort to make it appear otherwise, this dispute is not about the commercial marketplace; it is about the marketplace of ideas. East Frank used its Posts as commentary to illustrate both the silliness and unintended effects of Plaintiffs' protests. In response, Plaintiffs sued, not to vindicate a commercial interest, but to silence East Frank. Neither the Act nor the First Amendment countenance such conduct; as a result, Plaintiffs fail to plead plausible claims.

I.    RULE 12(b)(6) STANDARD.

A motion to dismiss pursuant to Rule 12(b)(6) tests the "legal sufficiency of the complaint." *E. Shore Markets, Inc. v. J.D. Assoc. Ltd. P'ship*, 213 F.3d 175, 180 (4th Cir. 2000). To survive the motion, a complaint must include "enough facts to state a

claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 678. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice," *id.* at 678, and courts need not accept unsupported or conclusory factual allegations devoid of any reference to actual events, *United Black Firefighters v. Hirst*, 604 F.2d 844, 847 (4th Cir. 1979). Furthermore, "[a]n affirmative defense permits dismissal if the face of the complaint includes all necessary facts for the defense to prevail." *Leichling v. Honeywell Int'l, Inc.*, 842 F.3d 848, 850-51 (4th Cir. 2016). Applying these standards, the Court should dismiss the Amended Complaint.

## II. PLAINTIFFS FAIL TO STATE A CLAIM UNDER THE ACT.

Plaintiffs attempt to allege violations of §§ 43(a)(1)(A)-(B). To plead a § 43(a)(1) claim, a plaintiff must allege that a defendant's misuse, in connection with goods or services, of a mark, or misstatement or misdescription of fact (A) will likely cause confusion as to the plaintiff's association with, or sponsorship or approval of, a defendant's goods, services, or commercial activities, resulting in damages to the plaintiff, or (B) in commercial advertising or promotion, misrepresent the nature, characteristics, qualities, or geographic origin of defendant's or plaintiffs' goods, services or commercial activities. 15 U.S.C. § 1125(a)(1)(A)-(B).

Plaintiffs state no claims under § 43(a). They allege three conclusory theories: (1) the Posts use "devices" in the form of "modified . . . photographs" in the Posts, (2)

the Posts contain "false or misleading representations of fact regarding Plaintiffs' approval or endorsement of [East Frank]'s business and services, and . . . the [Plaintiffs'] false affiliation, connection or association" and (3) the Posts contain "misdescriptions of fact regarding Plaintiffs' approval or endorsement of [East Frank's] business and services." (Am. Compl. ¶¶ 60-62). Look past those conclusory allegations and the Amended Complaint reveals three fatal flaws. First, Plaintiffs suffered no loss to commercial reputation or sales and therefore lack statutory standing to sue under the Act. Second, the Posts are parody, the kind of joking social commentary that contain no statements "of fact" and that receive full First Amendment protection. And third, the Amended Complaint lacks any allegations that show a plausible likelihood that East Frank's parodic posts could confuse a consumer as to Plaintiffs' sponsorship of East Frank. For these reasons, the Court should dismiss Plaintiffs' § 43(a) claims.

### A. Plaintiffs lack Statutory Standing because they fall outside the Act's Zone of Interests.

Plaintiffs must have a commercial injury to have statutory standing under the Act. *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 131-32 (2014). In *Lexmark*—a case involving a false advertising claim under § 43(a)(1)(B) of the Act—the Supreme Court reaffirmed the general presumptions that "a statutory cause of action extends only to plaintiffs whose interests 'fall within the zone of interests protected by the statute,'" *id.* at 129, and that "Congress . . . 'legislat[es] against the background of' [that] zone-of-interests limitation, 'which applies unless it is expressly negated,'" *id.* (quoting *Bennett v. Spear*, 520 U.S. 154, 163 (1997)).

Determining the scope of a statute's zone of interests ordinarily involves "traditional principles of statutory interpretation," *id.* at 128, but "[i]dentifying the interests protected by the Lanham Act . . . requires no guesswork, since the Act includes an unusual, and extraordinarily helpful, [detailed statement of the statute's purposes]" in its § 45. *Id.* (quotation omitted) (modifications in *Lexmark*).

To come within the Act's zone of interests, a plaintiff's interests must align with § 45's statement of purpose. *Id.* Section 45 describes Congress's intent to achieve five purposes. *See* 15 U.S.C. § 1127. Four of those five purposes involve the use of different categories of marks—since *Lexmark* was a § 43(a)(1)(B) false advertising case, it did not implicate those four purposes. Instead, *Lexmark* implicated only one § 45 purpose: "to protect persons engaged in [commerce within the control of Congress] against unfair competition." *Lexmark*, 572 U.S. at 131. In that context, "unfair competition" concerns "injuries to business reputation and present and future sales." *Id.* The Court concluded, therefore, that a § 43(a)(1)(B) plaintiff "must allege an injury to a commercial interest in reputation or sales" to come within the Act's zone of interest and thus have statutory standing. *Id.*

*Lexmark*, therefore, bars Plaintiffs' § 43(a)(1)(B) false advertising claim. Such a claim "may be involved only by those who 'allege an injury to a commercial interest in reputation or sales,'" *POM Wonderful, LLC v. Coca-Cola Co.*, 573 U.S. 102, 108 (2014) (quoting *Lexmark*, 572 U.S. at 132), and Plaintiffs allege no injury to any commercial interest.

*Lexmark*'s analytical framework applies with equal force, moreover, to the § 43(a)(1)(A) claim. "[T]here is no reason to think that the Supreme Court would apply different standing requirements" to claims under § 43(a)(1)(A). *Int'l Found. of Emple. Benefit Plans, Inc. v. Cottrell*, No. WDQ-14-1269, 2015 U.S. Dist. LEXIS 1542 *8 (D. Md. Jan. 7, 2015). To the contrary, since *Lexmark*, "numerous federal courts, including . . . the Fourth Circuit, have applied *Lexmark*'s standing requirement to claims for false association," *Geiger v. Abarca Family, Inc.*, 2022 U.S. Dist. LEXIS 167087 *19 n.6 (E.D. Va. July 29, 2022) (citing *Belmora, LLC v. Bayer Consumer Care AG*, 819 F.3d 697, 710-12 (4th Cir. 2016). That is, to have standing, Plaintiffs' interests must correspond with one or more of the purposes set forth in § 45.

There are only two § 45 purposes that could apply here, and both focus on commercial interests.[4] They are, first, "to protect persons engaged in [commerce within the control of Congress] from unfair competition," that is, the same purpose that *Lexmark* interpreted to require injury to a commercial interest in reputation or sales, 572 U.S. at 131; and, second, "to regulate commerce within the control of Congress by making actionable the deceptive and misleading use *of marks* in such commerce," 15 U.S.C. § 1127 (emphasis added).

Congress's use of the term "mark" in § 45, like its use of the phrase "unfair competition," signals its intent to cabin § 43(a) claims to commercial disputes over commercial injuries. "The term 'mark' includes any trademark, service mark,

---

[4] Three of § 45's purposes are facially inapplicable: they deal with *registered* marks or "rights and remedies stipulated by treaties and conventions," and this case involves no registered marks, treaties, or conventions. *Cf.* 15 U.S.C. § 1127.

collective mark, or certification mark." 15 U.S.C. § 1127. Trademarks and service marks[5] are "any word, name, symbol, or device, or any combination thereof" that are either "used by" a person for commercial purposes or for "which [the] owner has a bona fide intention to use in commerce." *Id.* Finally, "'use in commerce' means the bona fide use of a mark *in the ordinary course of trade.*" *Id.* (emphasis added). A likeness can function as a mark, *see, e.g., Brown v. Elec. Arts, Inc.*, 724 F.3d 1235, 1239 (9th Cir. 2013), but whether a likeness qualifies as a mark—and, in turn, whether the likeness's misappropriation causes an injury within the Act's zone of interests—depends on whether it exhibits the key characteristics of a mark under § 45: that is, a pre-existing or intended commercial use.

Thus, plaintiffs with § 43(a)(1)(A) claims based on misappropriation of likeness must allege that they have made prior commercial use of their likeness or that they have a bona fide present intent to commercialize their likeness. *See, e.g., Pesina v. Midway Mfg. Co.*, 948 F. Supp. 40, 43 (N.D. Ill. 1996) (holding a plaintiff "must demonstrate that he was a 'celebrity' when the defendants used his persona, name, and likeness; otherwise, his identity does not constitute an economic interest protectable under the Lanham Act"); *see also Uhlig, LLC v. Shirley*, No. 6:08-cv-01208-JMC, 2011 U.S. Dist. LEXIS 31833 *19-20 (D.S.C. Mar. 25, 2011) ("Moreover, a plaintiff claiming false association or endorsement must prove that he or she is a

---

[5] The facts of this case do not implicate any congressional concern for the misuse of collective marks (i.e., marks used to signify membership in a group) or certification marks (i.e., marks used to indicate that a good or service has received certain certifications). *Cf.* 15 U.S.C. § 1127.

'celebrity.'" (citing, *inter alia*, *Condit v. Star Editorial, Inc.*, 259 F. Supp.2d 1046, 1051 (E.D. Cal. 2003))).   At a minimum, a false association plaintiff must allege "(1) a present intent to use her identity for commercial purposes; (2) [a] past or existing commercial use of her image and identity, or that it has commercial value; or (3) that she competes commercially in the use of her persona."   *Id.* at 1052.   Otherwise, a plaintiff fails to plausibly allege the "present commercial interest in image or identity" that the Act requires.   *Id.* at 1051.

Plaintiffs alleged no present commercial interest in their likeness.   The only thing the Amended Complaint tells us about Plaintiffs is that they live in Union County, (Am. Compl. ¶ 11), and that they protest East Frank's drag shows.   (Am. Compl. ¶¶ 17, 31, 48).   The Amended Complaint fails to allege the nature of Plaintiffs' business activities, whether Plaintiffs currently or have ever sold endorsements or sponsorships, whether Plaintiffs currently or have ever otherwise commercialized their image or likeness, or whether Plaintiffs currently have any bona fide intention to commercialize their likeness.   *Cf. Shirley*, 2011 U.S. Dist. LEXIS 31833 *20 (holding evidence insufficient to establish commercial interest in name and likeness where plaintiff "merely asserted that he is a 'well regarded sales representative' with an 'excellent reputation' and 'significant name recognition'"); *Condit*, 259 F. Supp. 2d at 1052 (dismissing false association claim where plaintiff failed to allege any commercial celebrity status or any "present or prospective business activities or manifested intent to commercially exploit her identity").   As a result, Plaintiffs failed to plead a *commercial* injury and lack standing to sue under the Act.

The dearth of allegations as to the commercialization of Plaintiffs' likenesses distinguishes this case from those in which courts in this circuit have permitted false association claims to proceed. *See, e.g.*, *Valencia v. Midnite Rodeo, LLC*, No. 3:22-cv-665-RJC-DCK, 2023 U.S. Dist. LEXIS 195219 *2, 2023 WL 7031561 (W.D.N.C. Sept. 13, 2023) (denying Rule 12(b)(6) motion to dismiss § 43(a)(1)(A) false association claim where "Plaintiffs contend[ed] that they [were] each 'well-known professional model[s] who earn[] [their] livelihood[s] modeling and licensing [their] images to companies, magazines, and individuals for the purpose of advertising products and services"); *see also Geiger*, 2022 U.S. Dist. LEXIS 167087 *21 (denying Rule 12(b)(6) motion to dismiss § 43(a)(1)(A) false association claim where plaintiffs, a group of professional models, alleged a strip club's use of their images in its advertising "substantially injure[d] *their careers*") (emphasis added). Unlike the plaintiffs in *Valencia* and *Geiger*, the instant Plaintiffs failed to allege any fact that would permit the conclusion that Plaintiffs' extant or non-speculative future business or commercial interests were injured by the Posts—Plaintiffs have not even told us what business they are in, let alone how the Posts affect that business.

Indeed, Plaintiffs' claims stretch the Act well past Congress's intent. "[S]tanding to assert a § 43 claim is limited to a purely commercial class of plaintiffs." *Stayart v. Yahoo! Inc.*, 623 F.3d 436, 439 (7th Cir. 2010) (quotation omitted). "Case law has not recognized the extension of Section 43(a) . . . to protect individual non-commercial image or identity." *Condit*, 259 F. Supp. at 1051. Nor has Congress "evinced an intent to create a federal 'false light' tort claim for misappropriation of

image or identity, absent commercialization." *Id.* at 1054. But, Plaintiffs' claims, if accepted, would do just that: federalize common law publicity torts, many of which do not require any commercial injury. *Cf. id.* That result would expand the Act in a manner inconsistent with its text and history, open the floodgates to federal court litigation, and deprive state courts of the opportunity to develop their jurisprudence. That is, it would undermine the very policies that the zone of interests test protects. *See Bennett*, 520 U.S. at 162 (describing zone of interests test as one of several "judicially self-imposed limits on the exercise of federal jurisdiction").

This case is not about commercial injury—as the absence of allegations in Plaintiffs' Amended Complaint evidence, Plaintiffs have suffered no such injury. Instead, they hope to use the Act to silence East Frank's criticism of their defamatory protests and gain an upper hand in a social debate in which Plaintiffs intentionally and aggressively asserted themselves. *Cf. Radiance Found., Inc. v. NAACP*, 786 F.3d 316, 325 (4th Cir. 2015) ("Trademark protections exist neither to allow companies to protect themselves from criticism nor to permit them to 'control language.'"). Plaintiffs do not fall within the Act's zone of interests; they lack statutory standing, and the Court should dismiss their § 43(a) claims.

B.     Plaintiffs' § 43(a) Claims fail because the Posts are Protected Parodies.

The Posts are artistic and expressive works—parodies—that involve matters of public concern. They therefore contain no misstatement or misdescription "of fact." The Posts are, furthermore, entitled to full First Amendment protections, including the threshold test of *Rogers v. Grimaldi*, 875 F.2d 994, 1000 (2d Cir. 1989).

Speech that is not purely commercial—that is, speech that does "more than propose a commercial transaction," *United States v. Edge Broad Co.*, 509 U.S. 418, 426 (1993), or speech related to something other than "the economic interests of the speaker and its audience," *City of Cincinnati v. Discovery Network, Inc.*, 507 U.S. 410, 422 (1993), receives the fullest possible protection under the First Amendment. That is, expressive statements do not "forfeit [their] protection because they were published in the form of a paid advertisement." *New York Times Co. v. Sullivan*, 376 U.S. 254, 266 (1964).

The Posts do more than propose a commercial transaction: they parody Plaintiffs' protests. Parody is "a literary or artistic work that imitates the characteristic style of . . . a work for comic effect or ridicule." *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 580 (1994). "[P]arody and satire are deserving of substantial freedom – both as entertainment and as a form of social and literary criticism." *Cliffs Notes, Inc. v. Bantam Doubleday Dell Publ'g Grp., Inc.*, 886 F.2d 490, 493 (1989). The First Amendment thus protects parody even if it is contained in an advertisement, makes unauthorized use of its subject's image, and intentionally misattributes statements to its subject. *See generally Hustler Magazine v. Falwell*, 485 U.S. 46 (1988).

The Posts function as traditional parodies. In each, East Frank took a picture depicting the subject of its parody—Plaintiffs, non-party protestors,[6] and their

---

[6] The non-party protestors depicted in several of the modified images include the current mayor of Monroe, Robert Burns.

protests—and modified the picture for comedic effect and ridicule. The modifications were obvious and absurd: the June 24 Post, for example, depicted the protestors outside of City Hall with signs that spelled "BURGERS," with City Hall itself branded as the "East Frank fan club." (Am. Compl. ¶ 20). The alterations conveyed two ideas: first, that the protests and the protestors' claims (e.g., that East Frank was abusing or grooming children for sexual exploitation) were as nonsensical as standing outside of City Hall with signs that say "BURGERS," and, second, that consumer distaste for the protestors' extremism meant that the protests would, if anything, drive more customers to East Frank than away from East Frank (i.e., that in a figurative sense the protestors were, in fact, "supporters" of East Frank).[7]

The other Posts are similarly parodic. The modifications in the July 12 Post depict a cartoonish donkey standing behind two protestors with a sign that asks, "Does this burrito make my ASS Look big?" The protestors' signs (which, in the original photo, accuse East Frank, a restaurant, of "indulging predators"), are modified to read "5.00 Big aSS Burritos? Even we can't protest that!" (Am. Compl. ¶ 31). The reference evokes the protests and conveys a message: these protests are as ridiculous as a giant cartoon donkey, particularly given that East Frank is just a restaurant that sells burritos.

---

[7] East Frank also directly expressed this sentiment in its response to Plaintiff Toms's comment on the June 24 Post, where it told Plaintiff Toms (and everyone else who viewed the post) that he was part of "a loud minority who every time you comment, it boosts our post to the top of news feeds. That's why we sell out every show—you help us constantly." (Am. Compl. ¶ 30).

The July 15 Post, meanwhile, remodified the City Hall image so that the protestors' signs read "We ❤️ East Frank Superette And Kitchen." (Am. Compl. ¶ 33). City Hall retained its "East Frank fan club" branding and the word "Funroe," a play on "Monroe," appeared in the top right of the photo. Immediately above the modified photo, East Frank included a picture of a literal fan with eyeballs. The post reads "Todays post is about fans. There's me with our biggest fan—cool right? (Not sorry) And a nice group photo of our fan club. Fans are useful and blow a lot of air around." (Am. Compl. ¶ 33). The post's figurative language conveyed a straightforward, parodic message: the protests amounted to no more than "blow[ing] a lot of air."

The October 21 Post conveys a simple, direct message ridiculing the protestors. It calls them "true bigots," a direct reference to the extreme and dangerous messaging of their protests. (Am. Compl. ¶ 37).

From there, the Amended Complaint cherry picks a handful of earlier posts out of chronological order.[8] It starts, conveniently, with the March 3 Post, in which images of Plaintiffs Chabot and Metzger are superimposed on a poster for "Funroe's Royal Revue," a drag show, holding edited signs saying "Get your Tickets now!" and "It's going to sell Out!" (the original signs said "STOP SEXUALIZING CHILDREN" and "STOP GROOMING CHILDREN"). (Am. Compl. ¶ 48). But the March 3 Post was predated by the February 24 Post—that post used the *exact same* image of

---

[8] East Frank's social media pages, www.facebook.com/eastfranksuperette and www.instagram.com/eastfranksuperette, contain numerous posts that address the protests as well as other social issues—in context, the parody and social commentary of the Posts becomes even more apparent than when the Posts are viewed in isolation.

Metzger and Chabot holding signs modified to read: "I am unable to mind my own Business, and it Only helps Theirs!" and "Risk it On the brisket I did, and I Loved it!" That is, anyone viewing East Frank's social media pages would know that (a) the image was modified and (b) it was modified to convey the message, through humor, that these protestors should not be taken seriously and that, if anything, consumers should view the protests as a reason to support, not boycott, East Frank.

Finally, Plaintiffs complain of a June 25 Post that cuts and pastes an image of Plaintiff Metzger into a post about drag bingo. (Am. Compl. ¶ 52). In the post, Metzger's image appears beneath a word bubble containing a heart shape surrounding an image of a drag queen, the same drag queen depicted in the larger image upon which Metzger's photo is superimposed. The drag queen, meanwhile, is depicted with a thought bubble containing an image of a cheeseburger. The post says, "Hey Funroe! Everyone loves burgers on Saturday! and I mean EVERYONE!" *Id.* The post directly evokes the protests (by referencing the need to "bring folks together" and "build bridges") and suggests in a tongue-in-cheek fashion that a mutual love of burgers might "build a burger bridge." *Id.* It is not meant for literal interpretation—instead, it represents another instance in which East Frank uses sarcastic parody to undermine the protestors' seriousness.

The Posts, like all parodies, have two key characteristics that foreclose Plaintiffs' § 43(a) claims. First, any reference in the Posts to Plaintiffs are figurative or ironic, not literal—the Posts, therefore, contain no misstatement "of fact." Second, the Posts have expressive value. As a result, the *Rogers* test, rather than the

traditional likelihood of confusion test, applies to the Posts.  For both reasons, Plaintiffs fail to state a claim under the Act.

        1.     *The Posts' parodic content contains no false statement or misdescription "of fact."*

Parody "cannot 'reasonably [be] interpreted as stating actual facts.'"  *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 20 (1990).  "The general tenor of rhetorical speech, as well as the use of loose, figurative, or hyperbolic language sufficiently negates any impression that the speaker is asserting actual facts."  *Snyder v. Phelps*, 580 F.3d 206, 220 (4th Cir. 2009) (quotation omitted).  For that reason, claims for defamation, for example, which require proof (just like § 43(a)) of a false statement "of fact," are "mutually exclusive of parody."  50 Am. Jur. 2d Libel and Slander § 156.

None of the Posts contain misstatements of fact that are not intentionally ironic, hyperbolic, or figurative.  For example, the June 24 Post refers to the protestors as "supporters."  In the literal sense, this is untrue.  But its untruth serves a purpose; that is the nature of irony.  *See* Merriam-Webster.com, Definition of "Irony," available at https://www.merriam-webster.com/dictionary/irony (defining irony as "the use of words to express something other than and *especially the opposite of* the literal meaning" (emphasis added)).  Calling the protestors "supporters" is double entendre; it evokes the protests through irony and suggests that the protests might and should encourage consumers to support East Frank.  No one would take the post literally, just as no one could view the image and truly believe that the people depicted there went to City Hall with signs that spelled "BURGERS" (or, for that matter, truly believe that the child depicted in the post had a cartoon smiley face for

a head) (Am. Compl. ¶ 20), or that burgers "build bridges," (Am. Compl. ¶ 52), or that fans have cartoon faces, (Am. Compl. ¶ 33), or that the protestors "blow a lot of air around" to help "keep [East Frank] cool," as if they were a group of human air conditioners, *id.*

Or consider the July 12 Post—the one where a cartoon donkey stands next to two Plaintiffs on the sidewalk. In that modified photo, one Plaintiff holds a sign that says "5.00 Big aSS Burritos?" The other Plaintiff holds a sign that says "Even we can't Protest that!" (Am. Compl. ¶ 31). It is an obvious joke, and one that only works because it readily appears that the photo is a modified photo of individuals holding protest signs, just like the February 24 Post, where East Frank modified a Plaintiff's sign to read "I am unable to mind my own Business, and it Only helps Theirs," (Am. Comp. ¶ 50), and the March 3 Post, which poorly photoshopped the *exact same* image of the Plaintiffs one week later.

None of the Posts are susceptible to literal interpretation—none suggest serious sponsorship, endorsement, or association. Instead, they each use "loose, figurative, or hyperbolic language" to parody Plaintiffs and their protests. For these reasons, Plaintiffs fail to state a claim under the Act for the use of a false statement or misdescription "of fact."

        2.    *Plaintiffs' § 43(a) claims fail the* Rogers *test.*

Where, as here, a § 43(a) claim targets an expressive work, the Act's standard likelihood of confusion test "fails to account for the full weight of the public's interest in free expression." *Mattel, Inc. v. MCA Records*, 296 F.3d 894, 900 (9th Cir. 2002).

That is, "[e]ven some amount of 'actual confusion' must still be weighed against the interest in a less fettered marketplace of social issues speech." *Radiance Found.*, 786 F.3d at 325 (citing *Rogers*).

Unlike the standard likelihood of confusion test, the *Rogers* test strikes the appropriate balance between private publicity interests and the public's free speech interests.[9] The *Rogers* test applies "whenever the unauthorized use of another's mark is part of a communicative message and not a source identifier." *Champion v. Moda Operandi, Inc.*, 561 F. Supp. 3d 419, 434 (S.D.N.Y. 2021). "It applies specifically to 'commentary . . . news reporting or criticism.'" *Id.* (quoting *Cliffs Notes*, 886 F.2d at 495). Under the *Rogers* test, the Act will not apply to the use of someone's likeness in an artistic or expressive work unless the use "has no artistic relevance to the underlying work whatsoever," or the use "explicitly misleads its audience about the source of the content." *Hara v. Netflix, Inc.*, 2023 U.S. Dist. LEXIS 148717 *7-8 (C.D. Cal. Aug. 23, 2023) (quoting *Brown*, 724 F.3d at 1239, 1245).

Here, the alleged improper use (i.e., the unauthorized use of Plaintiffs' images) had direct relevance to the Posts' parody. "[T]he level of [artistic] relevance [of the trademark or other identifying material to the work] merely must be above zero for the . . . other identifying material to be deemed artistically relevant." *Brown*, 724 F.3d at 1243. In this case, the photos *make* the Posts—that is, East Frank intended

---

[9] The Supreme Court recently decided that the *Rogers* test did not apply in cases in which a trademark is used as a source-identifier. *Jack Daniel's Props. v. VIP Prods., LLC*, 143 S. Ct. 1578, 1590-91 (2023). The Supreme Court expressly reserved judgment as to the wider applicability of the *Rogers* test. *Id.* at 1592-93.

the Posts to lampoon Plaintiffs and their protests; without Plaintiffs' images, modified for comedic effect, the Posts would make no sense at all, let alone function as social commentary in the manner East Frank intended.

The Posts also do not explicitly mislead as to the source of the expressive work. East Frank is clearly the creator and author of each of the Posts, and the Posts do not name any Plaintiff or suggest that any Plaintiff approved of or endorsed the content of the Posts. Plaintiffs agree with this point. *See, e.g.*, (Am. Compl. ¶ 21 ("As is *obvious* from the East Frank June 24 Advertisement, its content was created by modifying the June 13 Group Photo." (emphasis added))); *see also* (Am. Compl. ¶ 40 ("As is obvious from the East Frank October 21 Advertisement, *Defendant* created its content by modifying, *without any of the Plaintiffs' or participants' approval or authorization*, the October 10 Group Photo." (emphasis added))). The Posts are whimsical in tone; they do not resemble an endorser's official statement of support. And many of the Posts directly criticize Plaintiffs. No one would conclude that Plaintiffs created a post referring to themselves as "true bigots." (Am. Compl. ¶ 37). Similarly, no one would conclude that Plaintiff Metzger created or approved a post that depicts her holding a sign that says "I am unable To mind my own Business, and it Only helps Theirs!" (Am. Compl. ¶ 50). Or, that Plaintiffs Metzger and Mullen approved a post depicting them with a cartoon donkey and asking the question: "Does this burrito Make my ASS Look big?" (Am. Compl. ¶ 31). Far from misleading, the Posts self-identify as East Frank's independent work. Plaintiffs' § 43(a) claim thus fails the *Rogers* test, and the Court should dismiss the claim.

C.    <u>Plaintiffs have failed to plausibly allege Likelihood of Confusion.</u>

Ordinarily, the Act's multifactor likelihood of confusion test—designed to determine whether consumers in the marketplace would be deceived by the defendant's conduct—is a fact-intensive inquiry.  There are at least nine factors: (1) the strength or distinctiveness of the plaintiff's mark as actually used in the marketplace; (2) the similarity of the two marks to consumers; (3) the similarity of the goods or services that the marks identify; (4) the similarity of the facilities used by the markholders; (5) the similarity of advertising used by the markholders; (6) the defendant's intent; (7) actual confusion; (8) the quality of the defendant's product; and (9) the sophistication of the consuming public.  *Grayson O Co. v. Agadir Int'l, LLC*, 856 F.3d 307, 314 (4th Cir. 2017).  At the pleading stage, a plaintiff must "allege facts regarding likelihood of confusion that would state a claim to relief that is plausible on its face."  *OffWhite Prods., LLC v. Off-White, LLC*, 480 F. Supp. 3d 558, 565 (S.D.N.Y. 2020).

Plaintiffs do not allege confusion.  The Amended Complaint mentions confusion only twice—once where it quotes from the Act, (Am. Compl. ¶ 59), and once where it says, as part of a state law claim, that East Frank's activities "[c]ause a likelihood of confusion or misunderstanding as to the sponsorship, approval, or association of East Frank's business and services with each Plaintiff."  (Am. Compl. ¶ 76(d)).  That conclusory allegation—which merely recites an element of the claim— is plainly insufficient to state a plausible claim for confusion.  *Cf. OffWhite Prods.*,

480 F. Supp. 3d at 565 (holding a similarly vague allegation was "easily put to one side, because it [was] conclusory and unsupported by any pled facts").

Problematically, though, Plaintiffs come no closer to alleging consumer confusion anywhere else in their Amended Complaint. Plaintiffs reference a commentor who responded to the June 24 Post by writing "Aw yay! I'm so glad there is so much support for you guys [heart emojis]." (Am. Compl. ¶ 26). But, even if the comment was meant literally, it only indicates that the poster believed that East Frank had "support"—which it does—not that East Frank had the *Plaintiffs'* support. Only confusion about the latter would suffice. Also, Plaintiff Toms commented on the June 24 Post to say "I DO NOT support east franklin grill OR their actions" and that "[t]his photo is a photo taken outside City Hall the night many of *us* showed up to make *our* feelings against your practices . . . and the *majority of the faces in the crowd are of the same opinion as I am*." (Am. Compl. ¶ 29 (emphasis added)). Toms continues, "this ["BURGERS"] sign was NOT in those photos taken that night and *I'm quite sure you approached none of those of us who disagree with your practices to get their approval to use those photos in your fake, misleading post*." *Id.* (emphasis added).

Given the parodic content of the Posts and the total absence of non-conclusory allegations of consumer confusion, the Amended Complaint fails to plausibly allege any likelihood of confusion. *Cf. Vans, Inc. v. MSCHF Prod. Studio, Inc.*, 88 F.4th 125, 137-38 (2d Cir. 2023) ("[W]here a message of 'ridicule or pointed humor' is clear, 'a parody is not often likely to create confusion' for 'consumers are not so likely to think

that the maker of a mocked product is itself doing the mocking.'"). The Court should therefore dismiss Plaintiffs' § 43(a) claims.

III. **THE FIRST AMENDMENT AND THE TRANSFORMATIVE USE TEST BARS PLAINTIFFS' MISAPPROPRIATION OF LIKENESS CLAIM.**

North Carolina recognized a claim for appropriation of likeness in *Flake v. Greensboro News Co.*, but *Flake* left open the question of how the First Amendment limited such claims. 212 N.C. 780, 790-92, 195 S.E.2d 55, 63-64 (1938). More recently, the N.C. Supreme Court recognized "the tension . . . between the First Amendment and the law of torts in [right of publicity] cases." *Renwick v. News & Observer Publ'g Co.*, 310 N.C. 312, 323, 312 S.E.2d 405, 423 (1984).

In other jurisdictions, courts balance an individual's right to control their likeness against First Amendment concerns through the transformative use test. *See, e.g., Comedy III Productions, Inc. v. Gary Saderup, Inc.*, 25 Cal. 4th 387, 407, 21 P.3d 797 (Cal. 2001) ("[W]hen an artist is faced with a right of publicity challenge . . . he or she may raise as [an] affirmative defense that the work is protected by the First Amendment inasmuch as it contains significant transformative elements . . . ."); *see also K & K Prods. v. Walt Disney Studios Motn. Pictures*, No. 2:20-cv-1753 JCM (NJK), 2021 U.S. Dist. LEXIS 182012 *16, 2021 WL 43944787 (D. Nev. Sept. 23, 2021) ("[T]he Nevada Supreme Court would adopt a transformative use affirmative defense to right-to-publicity claims"); *Mitchell v. Cartoon Network, Inc.*, No. CV 15-5668, 2015 U.S. Dist. LEXIS 157737, 2015 WL 12839135 *3 (D.N.J. Nov. 20, 2015) (dismissing a right-to-publicity claim based on the transformative use defense). Given *Renwick*, North Carolina would likely adopt the transformative use test.

Plaintiffs' Amended Complaint shows no plausible chance that Plaintiffs could overcome the transformative use test. That test uses several factors to determine whether a defendant's use "adds significant creative elements so as to be transformed into something more than a mere celebrity likeness or imitation." *Keller v. Elec. Arts, Inc.*, 724 F.3d 1268, 1273 (9th Cir. 2013); *see also id.* (listing five factors, including whether (1) the likeness functions as raw material for the creation of an original work (2) the work is "primarily the defendant's own expression" (3) the "literal and imitative or the creative elements predominate the work," (4) the work's economic value derives primarily from the fame of the celebrity depicted, and (5) the work is merely a "conventional portrait"). "[P]arody has an obvious claim to transformative value." *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 579 (1994).

None of the *Keller* factors favor Plaintiffs. The Plaintiffs' likenesses is raw material—they are synthesized with East Frank's modifications to convey a patently new and different message. The Posts are also East Frank's own expression, conveying messages beyond the Plaintiffs' likenesses. The literal and imitative or creative elements predominate the Posts—in each, East Frank's modifications are obvious and focused on achieving East Frank's parodic purposes. The Posts' "economic value," if any, derives from the parody (i.e., the mocking and ridicule) of Plaintiffs, not from Plaintiffs themselves. Finally, the Posts are nothing like a "conventional portrait"—they include modified depictions of Plaintiffs for the purpose of communicating a social message, not just to depict Plaintiffs' appearances. The

Posts are therefore transformative and the First Amendment bars Plaintiffs' claims for appropriation of likeness.

## IV. THE FIRST AMENDMENT BARS PLAINTIFFS' UNFAIR AND DECEPTIVE TRADE PRACTICES CLAIM.

Where a plaintiff premises its claim under the N.C. Unfair and Deceptive Trade Practices Act (the "UDTPA"), N.C. Gen. Stat. § 75-1.1 *et seq.*, on constitutionally protected conduct, the UDTPA claim must fail with the rest. *See Craven v. SEIU COPE*, 188 N.C. App. 814, 819, 656 S.E.2d 729, 733 (2008) (holding a UDTPA claim was properly dismissed when it was premised on a constitutionally-barred defamation claim). Here, Plaintiffs' UDTPA claim relies entirely on their §43(a) and appropriation of likeness claims, *see* (Am. Compl. ¶ 85), and like those claims, must be dismissed.

## V. THE COURT SHOULD DECLINE TO EXERCISE JURISDICTION OVER THE PENDENT STATE LAW CLAIMS.

If the Court grants East Frank's motion as to the § 43(a) claims but concludes that Plaintiffs have stated viable state law claims, then the Court should nevertheless decline to exercise supplemental jurisdiction over the remaining claims. "The district courts may decline to exercise supplemental jurisdiction over a claim . . . if . . . the district court has dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c)(3); *see also Rios v. Jenkins*, 390 F. Supp. 3d 714, 728 (W.D. Va. 2019) ("'When . . . the federal-law claims have dropped out of the lawsuit in its early stages and only state-law claims remain, the federal court should decline the exercise of jurisdiction." (quoting *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 (1988))); *id.*

("Generally, when a district court dismisses all federal claims in the early stages of litigation, it should decline to exercise jurisdiction over any remaining pendent state law claims by dismissing those claims without prejudice.").

CONCLUSION

This case falls well outside what Congress intended the Act to accomplish. Not only that, but Plaintiffs' claims threaten East Frank's First Amendment rights. For these reasons, the Court should grant East Frank's motion and dismiss the Amended Complaint.

This 12th day of April, 2024.

Respectfully,



By:    /s/ Bo Caudill
       Bo Caudill
       N.C. Bar No. 45104
       bocaudill@villmercaudill.com
       Sophia M. Pappalardo
       N.C. Bar No. 56743
       sophiapappalardo@villmercaudill.com
       VILLMER CAUDILL, PLLC
       P.O. Box 18186
       Charlotte, NC 28218
       Tel: (704) 216-8120
       Fax: (704) 705-8191
       *Counsel for East Frank*